UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| UNITED STATES OF AMERICA, | : | CRIMINAL CASE NO. |
| --- | --- | --- |
|  | : | 3:18-CR-330 |
| v. | : |  |
|  | : |  |
| JONATHAN RIVERA, | : | JULY 2, 2019 |
| Defendant. | : |  |

**RULING RE: MOTION TO SUPPRESS (DOC. NO. 38), AMENDED MOTION TO SUPPRESS AND SUPPORTING AFFIDAVIT (DOC. NO. 53), AND SUPPLEMENTAL MOTION IN SUPPORT OF ORAL ARGUMENT UNDER <u>FRANKS V. DELAWARE</u> (DOC. NO. 54).**

**I.   INTRODUCTION**

Pending before the court is defendant Jonathan Rivera's Motion to Suppress ("Mot. Suppress") (Doc. No. 38), Amended Motion to Suppress ("Am. Mot. Suppress") (Doc. No. 53), and Supplemental Motion in Support of Oral Argument ("Suppl. Mot. Oral Arg.") (Doc. No. 54). Rivera seeks the suppression of "all evidence seized as a result of the execution of the tainted search warrant for the 3rd floor apartment at 120-122 Fairfield Avenue. Am. Mot. Suppress at 9. Rivera argues that a search warrant obtained by law enforcement was tainted by illegal police action that occurred prior to the issuance of the search warrant. <u>Id.</u> at 4. In addition, Rivera requests that the court hold a hearing to determine whether the evidence seized pursuant to the search should be suppressed pursuant to <u>Franks v. Delaware</u>, 438 U.S. 154 (1978). The court held oral argument on June 12, 2019.

For the reasons stated below, Rivera's Motion to Suppress (Doc. No. 38) is terminated as moot, Rivera's Amended Motion to Suppress (Doc. No. 53) is denied, and Rivera's Supplemental Motion in Support of Oral Argument (Doc. No. 54) is denied.

1

## II. FACTS

The court finds the following facts. Between November and December 2018, a registered confidential informant ("CI") contacted Hartford Police Department detectives Abhilash Pillai ("Pillai") and Jeffrey Moody ("Moody"). See Affidavit and Application for Search and Seizure Warrant ("Affidavit") (Doc. No. 46-1) at 3. The CI informed detectives that he/she was aware of drug trafficking occurring in the area of Roxbury Street and Fairfield Avenue, in Hartford, Connecticut. Id. The CI stated that he/she had seen a Hispanic male using two vehicles: a white Toyota Rav 4 and a black Infiniti sedan. The CI reported that the Hispanic male was selling large quantities of crack cocaine and heroin in the area. Id.

On December 5, 2018, Pillai and Moody, along with other law enforcement officers, conducted surveillance in the area of Newbury Street, Mapleton Street, Fairfield Avenue, and Roxbury Street. Id. Pillai observed a white Toyota Rav 4 parked in the driveway of 120-122 Fairfield Avenue. Based on the CI's statements, Pillai conducted surveillance on the Toyota Rav 4. Id. Pillai later observed a Hispanic male leave 122 Fairfield Avenue, enter the Toyota, and drive east on Roxbury Street and south on Newbury Street. Id. at 4. The Toyota came to a stop on McKinley street, after which a surveillance unit observed the driver of a blue Hyundai Sonata exit his vehicle, approach the Toyota, reach into the Toyota, and then place an unknown object in his sweatshirt pocket. Id. Officers followed the Hyundai and observed the driver commit a traffic violation. Id. Uniformed officers conducted a motor vehicle stop on the Hyundai. Id. Officers also conducted an investigative stop of the Toyota. Id.

After officers asked whether he was in possession of anything illegal, the driver of the Hyundai stated that he was in possession of illegal drugs. Id. at 5. The driver

2

turned over a clear plastic bag filled with wax paper sleeves, some of which sleeves were stamped with a "Gatorade" symbol.  Id.  The sleeves contained a white substance and white rock-like substance.  Id.  The white, powdery substance tested positive for fentanyl, and the rock-like substance tested positive for cocaine.  Id.  After being informed of and acknowledging his Miranda rights, the driver of the Hyundai told officers that he had purchased the substances from "a guy in a white SUV on McKinley street."  Id.

Upon conducting the motor-vehicle stop on the Toyota, officers placed the driver, Rivera, under arrest for sale of narcotics.  Id.  After arriving on scene, Pillai informed Rivera of his Miranda rights, which rights Rivera waived.  Id.  Upon questioning as to his residence, Rivera informed Pillai he did not live at 122 Fairfield Avenue, and that the address was his "girl's" residence.  Id.  When asked if there was anything illegal at 122 Fairfield Avenue, Rivera replied that a firearm was stored there, but that he had a permit for the firearm.  Id.  Rivera told officers a few minutes later that the firearm was actually stored in his vehicle, an Infiniti parked at 120-122 Fairfield Avenue.  See Government's Supplemental Memorandum of Law in Opposition to Defendant's Motion to Suppress ("Govt. Suppl. Mem. in Opp.") (Doc. No. 56) at 2.  Pillai informed Rivera that officers had witnessed him conduct a suspected hand-to-hand drug transaction on McKinley street, to which Rivera replied that he was just trying to make some extra money.  Affidavit at 5.  Rivera also stated that he knew he made a mistake by selling drugs.  Rivera repeated that he did not live at the Fairfield Avenue address, told officers that he did not have keys to the address, and stated that his "girl" lived in the third-floor apartment along with her children.  Id. at 5–6.

Officers travelled to 120-122 Fairfield avenue. Id. at 6. Using keys recovered from the Toyota, they opened the locked south entryway door to 120-122 Fairfield Avenue. Id. Officers proceeded up a staircase to the second floor and knocked on the door to the second-floor apartment. Id. Officers spoke with an elderly Hispanic woman who stated that she lived in the second-floor apartment, and that her granddaughter resided on the third floor with her children and her boyfriend. Id. Officers approached a second interior door, and used a key recovered from the Toyota to open the door. Id. Upon proceeding up the staircase to the third-floor, officers realized that the interior second-floor door led directly into the third-floor apartment. Id. at 6–7. Officers announced their presence, after which a woman, identified as Melissa Diaz, called out that she was naked in a bedroom. Id. at 7. After Diaz dressed herself, officers conducted a protective sweep of the apartment. Id. Adult male clothing was seen in the bedroom where Diaz had been located. Id.

When Pillai and Moody arrived at the third-floor apartment, Pillai informed Diaz of her Miranda rights, which she acknowledged. Id. Diaz declined to consent to a search and informed the detectives that she wished to speak to her attorney. Id. Pillai and Moody returned to the Vice and Narcotics Office to draft a search warrant affidavit, while other officers remained on scene to secure the apartment. Id.

### III. DISCUSSION

The government argues in its Memorandum in Opposition to the Motion to Suppress ("Mem. Opp. Suppress") (Doc. No. 46), that Rivera has failed to establish standing to challenge the search of 120-122 Fairfield Avenue. See Mem. Opp. Suppress at 7–8. The government argues that Rivera denied living at the Fairfield Avenue address and instead stated that his girlfriend lived there. See id. at 7. The

government also argues that, when officers spoke to Melissa Diaz, the "owner-occupant of the of the third[-]floor apartment," she told law enforcement that Rivera did not live in the apartment.  Id.

However, Rivera filed an Amended Motion to Suppress on June 7, 2019.  See Am. Mot. Suppress.  Attached to the Amended Motion to Suppress, which is in all other material respects identical to the original Motion to Suppress, is an Affidavit swearing that, "[a]t or around December 5, 2018, [he] was a resident of the 3rd floor apartment of 120-122 Fairfield Avenue in Harford CT . . . ."  See Affidavit of Jonathan Rivera ("Rivera Affid.") (Doc. No. 53-1) ¶ 1.  Given Rivera's sworn statement, the court concludes he has standing to challenge a search of the third-floor apartment.  Moreover, because the Amended Motion to Suppress is, in all material respects, duplicative of the original Motion to Suppress, Rivera's Motion to Suppress (Doc. No. 38) is terminated as moot.

Rivera argues that law enforcement's earlier, warrantless entry into the apartment building and later the third-floor apartment itself, "tainted" the later warrant application and rendered any evidence seized as a result of the later search subject to suppression.  See Am. Mot. Suppress at 5–6.  Rivera argues that, when the police entered the building at 120-122 Fairfield Avenue through a locked door, all later actions constituted a "search" under the Fourth Amendment because "the residents of the home had sufficiently secured the premises such that they had a reasonable expectation of privacy within all areas of the home."  Id. at 6.

First, Rivera has failed to demonstrate that he had a reasonable expectation of privacy in the common entryway to the building at 120-122 Fairfield drive.  Indeed, there is no evidence before the court to support a finding that Rivera or the other residents

had a reasonable expectation of privacy in the common hallway. Rivera "did not endeavor to show circumstances regarding his relationship with the other renters, their particular use of the common areas, or any other factor that might conceivably form the basis of a conclusion that the officers' presence in the common hallway . . . implicated [his] reasonable privacy expectations." United States v. Bedell, 311 F. App'x 461, 463 (2d Cir. 2009).

While Rivera argues that the reasonable expectation of privacy stems from the fact that the initial entryway door to 120-122 Fairfield Avenue was locked, that door was an entryway into a common hallway. As the Second Circuit has held, the mere presence of a locked entryway is insufficient to establish an expectation of privacy in a common hallway. See, e.g., United States v. Barrios-Moriera, 872 F.2d 12, 14 (2d. Cir 1989) ("Here the police entry was into a common hallway, an area where there is no legitimate expectation of privacy. Thus, a warrantless arrest is permissible even though the area was guarded by a locked door."). In short, Rivera has provided no argument or evidentiary support for the assertion that "the residents of the home had sufficiently secured the premises such that they had a reasonable expectation of privacy within all areas of the home." Am. Mot. Suppress at 6.

Rivera argues that the officers' entry into the third-floor apartment, followed by the fact that they "occupied the home continuously for over four hours," was a violation of the Fourth Amendment. Id. Even assuming that the officers violated Diaz's Fourth Amendment rights through their conduct, Rivera would have no resultant basis to suppress evidence in his criminal case. "Fourth Amendment rights are personal rights . . . [that] may not be vicariously asserted." United States v. Hagg, 278 F.3d 44, 47 (2d

6

Cir. 2002) (quoting Rakas v. Illinois, 439 U.S. 128, 133-34 (1978)).  A defendant's Fourth Amendment rights are therefore violated "only when the challenged conduct invaded his legitimate expectation of privacy rather than that of a third party." Id. (citation omitted).  As the Second Circuit has noted, whether the police are "not lawfully present" or "trespassing" on a property where evidence is found is "not the relevant inquiry" in determining whether such evidence is subject to suppression.  See Bedell, 311 F. App'x at 462.  Here, Rivera argues that the officers' actions were "offensive to the right to be free from governmental entry into the home."  Am. Mot. Suppress at 7.  He argues that police "took a key and entered into the home of a naked woman without permission or a valid legal reason," searched the home without a warrant, and "detained the resident of the apartment for more than four hours."  Id. at 8.

However, Rivera has provided no support for the claim that the officers "searched" the apartment absent a warrant.  Indeed, the evidence suggests that the officers conducted a protective sweep of the apartment, but not that they conducted a search for evidence.  Moreover, any "detention" of Diaz—assuming that is the correct description of what occurred—did not implicate Rivera's Fourth Amendment rights, since he was not the person detained.  In short, Rivera failed to demonstrate how the officers' conduct in the third-floor apartment violated his Fourth Amendment rights.

Third, applying the "corrected affidavit test" to the facts at issue in this case, a neutral magistrate would still have probable cause upon which to issue a search warrant.  "[A] search pursuant to a warrant issued by a judicial officer upon a finding of probable cause is presumptively reasonable." Ganek v. Leibowitz, 874 F.3d 73, 81 (2d Cir. 2017).  The presumption can be overcome where the defendant can show that an

7

officer "(1) knowingly and deliberately, or with a reckless disregard of the truth, procured the warrant, (2) based on false statements or material omissions, that (3) were necessary to the finding of probable cause." Id. Rivera argues that the Affidavit falsely states that officers travelled to 120-122 Fairfield Avenue to "try and make contact with the resident." Suppl. Mot. Oral Arg. (Doc. No. 54) at 2. Instead, he argues that officers went to the building to "gain entry to the 3rd floor apartment, by whatever means were necessary . . . ." Id. Rivera argues this intent is made clear by reference to four arguments: (1) the officers' actions raise an inference that their intent was not merely to make contact with a resident; (2) the officers' failed to inventory Rivera's keys, instead going to 120-122 Fairfield Avenue with them; (3) the number of law enforcement officers—five—indicates that the officers did not simply intend to make contact with a resident, but rather intended to intimidate a resident into providing consent to search; and (4) the officers failed to leave after Diaz told them they could not search the apartment. See id. at 3–6. Rivera also argues that Pillai omitted Rivera's statement that his gun was actually in the Infiniti sedan, rather than in the third-floor apartment, from the Affidavit. Id. at 6. Rivera also argues that the officers improperly included information in the Affidavit regarding evidence which was obtained when they entered the third-floor apartment prior to the issuance of a search warrant. See Am. Mot. Suppress at 4.

  Assuming, arguendo, that the Affidavit contains materially false statements or omissions, and that the affiant made such statements either intentionally or with reckless disregard for the truth, the appropriate next step is to remove any improper statements and add any material omissions to create a hypothetical, "corrected

affidavit."  Thereafter, looking to the corrected affidavit, the court must determine whether probable cause to issue the warrant would still exist.  See Ganek, 874 F.3d at 82.  "If probable cause is lacking after such correction, then the false statement was 'necessary' to secure issuance of the warrant.  Id.

Rivera argues, in his Reply to the Government's Supplemental Memorandum of Law, that it is "obvious" that a corrected affidavit would not provide probable cause to issue a warrant, because a judge likely relied on the potential presence of a firearm in the apartment as a basis to grant the search warrant application.  See Defendant's Reply to the Government's Supplemental Memorandum of Law in Opposition ("Def.'s Reply") (Doc. No. 57) at 2–3.  Rivera argues that the potential presence of a firearm in the third-floor apartment was "the strongest and best argument for a probable cause finding in the search warrant application."  Id. at 3.[1]  The court disagrees.

Here, even accepting as true all of Rivera's arguments, removing all information in the Affidavit gained after the entry to the third-floor apartment at 120-122 Fairfield Avenue, replacing the stated reason for travelling to 120-122 Fairfield Avenue with the statement that the officers intended to see if they could gain entry to the apartment by consent, a judge would still have had probable cause to issue a search warrant. Removing all evidence obtained after entry to the third-floor apartment, correcting the

---

[1] Rivera also places great weight on the fact that officers only saw him conduct one drug transaction, and only saw him exit Fairfield avenue one time.  See Def.'s Reply at 4–5.  This argument fails both on its face and in the context of the entirety of the evidence before the issuing judge.  Standing alone, Rivera fails to articulate why probable cause must rest on more than one drug transaction being witnessed, or why officers must have viewed his entry and exit from the building multiple times.  In the context of the entirety of the evidence, for example, the latter argument fails to account for Rivera's own statement that his "girl" lived at 120-122 Fairfield Avenue, as well as the statement of the second-floor resident, who stated that her granddaughter lived in the third-floor apartment with her boyfriend.  See Affidavit at 5–6.

statement regarding the officers' intent, and correcting the reference to Rivera's firearm, such that its recovery in the Infiniti was clearly referenced, the Affidavit included the following information: A confidential informant ("CI") informed law enforcement that a young Hispanic male, operating a white Toyota Rav 4 and a black Infiniti sedan, was selling large quantities of crack cocaine and heroin in the area of Fairfield Avenue. See Affidavit at 3. During a surveillance operation on December 5, 2018, law enforcement observed Rivera exit 120-122 Fairfield Avenue, and drive away in a white Toyota Rav 4 to a location on McKinley Street, where another individual exited their vehicle, reached into the Toyota, and placed an unknown object in their pocket. Id. Upon the execution of motor vehicle stop, the individual who had reached into Rivera's vehicle told law enforcement that he was in possession of narcotics, which were identified as fentanyl and cocaine. Id. at 5. The individual told officers he had purchased the narcotics from "a guy in a white SUV on McKinley Street." Id. The individual later identified Rivera in a photo array as the person who sold him the narcotics. Id. at 6. Furthermore, Rivera admitted to selling narcotics and, while he denied living at the Fairfield Avenue address, he stated that his "girl" lived on the third floor with her children. Id. at 5. Officers spoke with an elderly Hispanic woman who stated that she lived in the second-floor apartment, and that her granddaughter resided on the third floor with her children and her boyfriend. Id.

Based on the facts presented in the corrected affidavit, ample probable cause existed to believe (1) that Rivera was involved in distribution of narcotics, including cocaine and fentanyl; (2) that he had access to 120-122 Fairfield Avenue; (3) that he travelled to conduct sales of narcotics from that same location; and (4) that Rivera had

ties to the location in the form of a girlfriend he stated lived at the address, and that he potentially lived at the address, despite his statements to the contrary. In short, even removing the information Rivera argues was improper, and adding the facts he argues were omitted, the Affidavit provided probable cause to support the issuance of a search warrant.

For the foregoing reasons, Rivera's Motion to Suppress (Doc. No. 38) is **TERMINATED AS MOOT**, Rivera's Amended Motion to Suppress (Doc. No. 53) is **DENIED**, and Rivera's Supplemental Motion in Support of Oral Argument (Doc. No. 54) is **DENIED**.

 **SO ORDERED.**

Dated at New Haven, Connecticut this 2nd day of July 2019.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge